UNITED STATES DISTRICT COURT　　　FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

---

ONEWEST BANK, FSB, and DEUTSCHE
BANK NATIONAL TRUST COMPANY, as
Trustee and Supplemental Interest Trustee with
respect to IndyMac IMSC Mortgage Loan
Trust 2007-AR2, MortgagePass Through
Certificates Series 2007-AR2,

　　　　　　　　　　　　　Plaintiffs,

– versus –

JOAM LLC, DEAN A. RESKAKIS,
ANTHONY HORAN, FAIGE NEUMANN
a/k/a FAGIE NEUMANN, ESTHER EREZ,
SARA OVITS, SACCO & FILLAS, LLP,
THE MORTGAGE ZONE, INC., GE LAND
SERVICES, INC. d/b/a GE ABSTRACT LLC,
85 PULASKI STREET CORP., and JOHN
DOES 1-20,

　　　　　　　　　　　　　Defendants.

MEMORANDUM
AND ORDER

10-CV-1063 (JG) (SMG)

A P P E A R A N C E S :

  ALISON GREENBERG, LLC
    14 Penn Plaza, Suite 2116
    New York, NY 10122
  By: Alison Greenberg
    *Attorney for Plaintiffs*

  PANZAVECCHIA & ASSOCIATES
    1050 Franklin Ave., Suite 302
    Garden City, NY 11530
  By: Mark A. Panzavecchia
    *Attorney for Defendant Dean Reskakis*

  ABRAMS, GORELICK, FRIEDMAN & JACOBSON, P.C.
    One Battery Park Plaza, 4th Floor
    New York, NY 10004
  By: Sinan Aydiner
    *Attorney for Defendant Sacco & Fillas, LLP*

LEGAL SERVICES FOR THE ELDERLY IN QUEENS
97-77 Queens Boulevard, Suite 600
Rego Park, NY 11374
By:    Donna Dougherty
*Attorney for Defendant Faige Neumann*

JOHN GLEESON, United States District Judge:

Plaintiffs OneWest Bank, FSB ("OneWest") and Deutsche Bank National Trust Company ("Deutsche Bank"), as Trustee, allege in their Third Amended Complaint ("Complaint") that defendants Joam LLC ("Joam"), Dean A. Reskakis, Anthony Horan, Fagie Neumann, Esther Erez, Sara Ovits, Sacco & Fillas, LLP ("S&F"), The Mortgage Zone, GE Land Services Inc. d/b/a GE Abstract LLC, and 85 Pulaski Street Corp. ("85 Pulaski") defrauded plaintiffs in connection with a mortgage loan for property located at 1432 East 14th Street, Brooklyn, NY 11230 (the "Property"). Defendants S&F, Reskakis and Neumann now move to dismiss the Complaint on various grounds.[1]

This is the moving defendants' second set of motions to dismiss, which have been styled as "renewed" motions to dismiss upon limited discovery. In July 2011, I provisionally denied the first set of motions to dismiss, subject to limited discovery to allow the plaintiffs to obtain documents establishing an affirmative assignment of ancillary claims when the mortgage note in question was initially assigned. *See* Memorandum and Order, No. 10-CV-1063 (JG) (SMG) (E.D.N.Y. July 26, 2011) (ECF No. 88) ("July Order"). The plaintiffs have now obtained such documents, and therefore I deny the motions to dismiss in substantial part. However, I dismiss the plaintiffs' claims for attorney malpractice for lack of standing, because the plaintiffs' claims derive from an assignment contract governed by California law, and under California law, such claims are unassignable.

---

[1] S&F filed a renewed motion to dismiss the complaint (ECF No. 99), which Reskakis joined in full (ECF No. 100). Neumann filed a separate motion to dismiss the claims against her, in which she also adopted and incorporated S&F's arguments. (ECF No. 98.)

## BACKGROUND[2]

A.  *The Facts*

   1.  *Original Loan Transaction*

In 1998 Joseph Gutman deeded the Property to his three daughters, Neumann, Erez and Ovits (the "sisters") as tenants in common. (Compl. ¶ 27.)[3] On December 18, 2006, the sisters entered into a contract to sell the Property to Joam for $715,000. (*Id.* ¶ 28.) Reskakis, an attorney employed by S&F, represented Joam in the sale, which was completed on January 29, 2007. (*Id.* ¶ 29.) The transfer of title was never recorded and Joam has no recorded interest in the Property. (*Id.* ¶ 30.)

Three weeks after executing the sale contract with Joam, the sisters allegedly entered into a second contract to sell the Property on January 7, 2007 – this time, to Horan. (*Id.* ¶ 31.) The purchase price of this second sale of the Property was $1,300,000. (*Id.* ¶ 32.) To finance the purchase, Horan obtained a first mortgage loan ("Horan Loan") from American Brokers Conduit ("American Brokers")[4] in the amount of $999,999.[5] Reskakis acted as agent and attorney for American Brokers for this transaction, in spite of having facilitated the sale of the same Property from the sisters to Joam soon before. (*Id.* ¶ 34.) The Horan Loan closed on April 13, 2007. (*Id.* ¶ 35.) On that day, American Brokers wired the $999,999 sum to Reskakis,

---

[2] The facts are largely drawn from the Complaint, which for purposes of this motion are assumed to be true. I have also considered the contracts governing the chain of assignment of the loan, because the Complaint relies heavily upon the terms and effect of these contracts, rendering them "integral" to the Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).
[3] The Complaint is filed at ECF No. 45.
[4] This entity is identified by the Complaint as American Home Mortgage d/b/a American Brokers Conduit. (Compl. ¶ 2.) American Brokers acted as the lender for the loan, while The Mortgage Zone acted as the broker. (*Id.* ¶ 33.)
[5] The Complaint alleges that Horan misrepresented his employment and income on his mortgage application. (Compl. ¶ 40.) Horan listed Joam as his employer on the application. (*Id.*) A "verification of rent" provided by 85 Pulaski to American Brokers in connection with Horan's loan application misrepresented Horan's rental status and monthly rent. (*Id.* ¶ 41.) Checks drawn on the S&F Attorney Trust Account reveal that 85 Pulaski received roughly $250,000 from the loan proceeds. (*Id.* ¶¶ 42-44.) Joam received $480,000 of the loan proceeds. (*Id.* ¶ 45.)

3

and Horan executed a Mortgage and Note in favor of American Brokers.[6] (*Id.* ¶¶ 36-38.) Reskakis failed to record the second sale of the Property. (*Id.* ¶ 50.) Reskakis also failed to obtain title insurance for the Property, failed to pay off existing liens on the property, failed to prepare an accurate HUD-1 Settlement Statement, failed to distribute funds in accordance with the HUD-1 Settlement Statement and failed to account for the funds that American Brokers sent to him. (*Id.* ¶¶ 49-50.) Reskakis made several distributions of funds from the Horan Loan proceeds by checks written on the S&F attorney account. (*Id.* ¶¶ 42-44, 47.) Reskakis was employed by S&F during the sales to Joam and Horan, and allegedly S&F was aware of Reskakis's wrongful actions and of other incidents of intentional wrongdoing and malpractice by Reskakis prior to the Horan Loan. (*Id.* ¶¶ 52-53.)

2. *Transfer of Horan Loan from American Brokers to IndyMac*

Around May 2007, a batch of mortgage loans including the Horan Loan was sold by American Brokers to IndyMac Bank, F.S.B. ("IndyMac"). A document called the Mortgage Loan Purchase and Interim Servicing Agreement ("MLPISA")[7] governed this transaction. The MLPISA states that it is "intended to set forth the terms and conditions by which Seller [*i.e.*, American Brokers] shall transfer and Purchaser [*i.e.*, IndyMac] shall acquire" certain mortgage loans. (MLPISA, p. 1.) The MLPISA defined "Mortgage Loan" as "[a]n individual mortgage loan which is the subject of this Agreement, . . . [as] identified on the Mortgage Loan Schedule, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, and all other rights, benefits, proceeds and obligations arising from or in connection with such

---

[6] The promissory note is filed at Greenberg Dec., Ex. A (ECF No. 102).
[7] The MLPISA is filed in two places: at Aydiner Aff., Ex. B (ECF No. 99) and at Colagiacomo Dec., Ex. A (ECF No. 104).

Mortgage Loan."[8] (MLPISA, art. I, p. 4.) A Mortgage Loan Schedule from American Brokers' records includes the Horan Loan at line 51.[9] (Colagiacomo Dec. ¶ 6.) A letter entitled "Purchase Bid and Trade Confirmation"[10] sent from IndyMac to American Brokers on May 4, 2007, described the transaction as a "servicing-released purchase," confirming that the sale included the servicing rights for the loans. (Colagiacomo Dec. ¶ 6; Voulo Dec. ¶ 3).

The MLPISA contained the following California choice-of-law provision at § 5.08: "This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to agreements entered into and wholly performed within that state." (MLPISA § 5.08, p. 25.)

3. *Pooling and Service Agreement Among IndyMac, IndyMac MBS, and Deutsche Bank*

On July 1, 2007, IndyMac, IndyMac MBS, Inc. ("IndyMac MBS"), and Deutsche Bank entered into a Pooling and Servicing Agreement ("PSA").[11] Pursuant to § 2.01 of the PSA, IndyMac transferred ownership of the Horan Loan to IndyMacMBS. (PSA § 2.01.)[12] IndyMac MBS then assigned its interest in the loan to a trust controlled by Deutsche Bank. (PSA p. 1.) However, under § 3.01 of the PSA, IndyMac retained servicing rights over the loan, including the right to "undertak[e] any legal action that it may deem appropriate with respect to the

---

[8] The MLPISA defines "Mortgage Note" as "the note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage." (MLPISA, art. I, p. 6). The Mortgage Note is thus distinguishable from the Mortgage Loan.
[9] This Mortgage Loan Schedule is filed at Colagiacomo Dec., Ex. C (ECF No. 104).
[10] The Purchase Bid and Trade Confirmation is filed at Colagiacomo Dec., Ex. B (ECF No. 104).
[11] The PSA is filed at Aydiner Aff., Ex. C (ECF No. 99), and the PSA schedule reflecting that the Horan Loan was one of the pooled loans is filed at Greenberg Dec., Ex. B (ECF No. 102). The PSA contains a New York choice-of-law provision, stating, "This agreement shall be construed in accordance with and governed by the substantive laws of the state of New York applicable to agreements made and to be performed in the state of New York and the obligations, rights and remedies of the parties hereto and the certificateholders shall be determined in accordance with such laws." (PSA § 10.03, p. 105.)
[12] The PSA provided that IndyMac "hereby transfers to [IndyMac MBS], without recourse, all the interest of [IndyMac] in each Mortgage Loan, including all interest and principal received or receivable." (PSA § 2.01.)

Mortgage Loans including, without limitation, any rights or causes of action arising out of the origination of the Mortgage Loans."[13] (PSA § 3.01.)

   4.   *IndyMac Goes Into FDIC Receivership*

In July 2008, the Office of Thrift Supervision closed IndyMac and appointed the FDIC as receiver, pursuant to 12 U.S.C. § 1464(d)(2)(A). (Compl. ¶ 8.) At that time, the FDIC, "by operation of law, succeed[ed] to . . . all rights, titles, powers, and privileges of" IndyMac, and obtained the right to "perform all functions of" IndyMac. *See* 12 U.S.C. § 1821(d)(2)(A)-(B). The FDIC then created a new entity called IndyMac Federal Bank, FSB ("IndyMac Fed"), with itself as conservator. *See id.* § 1821(d)(2)(F) (conferring this power on FDIC). On July 11, 2008, the FDIC-as-receiver for IndyMac, the FDIC-as-conservator for IndyMac Fed, and the FDIC for itself entered into an agreement entitled the Amended and Restated Insured Deposit Purchase and Assumption Agreement ("APAA").[14] Under the APAA, IndyMac Fed assumed all "right, title, and interest" of IndyMac in the Horan loan. (APAA § 3.1.)[15] However, § 3.4(b) of the APAA excluded from the assignment "any interest, right, action, claim, or judgment against (i) any . . . attorney, or any other Person employed or retained by the Failed Bank [*i.e.*, IndyMac] . . . arising out of any act or omission by such Person in such capacity . . . or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank;

---

[13] I note the anomaly that Deutsche Bank is a plaintiff in this case, despite the plaintiffs' own argument that Deutsche Bank's assignor, IndyMac MBS, was bereft of the right to bring ancillary claims arising from the origination of the Horan Loan – as this right was retained by IndyMac under the PSA. I asked the parties about this anomaly at oral argument, and neither party seemed troubled by Deutsche Bank's presence in the lawsuit. Therefore I will not take any action at this time with respect to Deutsche Bank's right to bring this lawsuit, as distinct from OneWest's.

[14] The APAA is filed at Aydiner Aff., Ex. D (ECF No. 99).

[15] APAA § 3.1 provides: "Assuming Bank [*i.e.*, IndyMac Fed] hereby acquires from the Receiver [*i.e.*, the FDIC as receiver for IndyMac], and the Receiver hereby[] assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the following: . . . (d) Loans; . . . (u) mortgage servicing rights and related contracts."

provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered . . . ."

     5.     *Assignment of Horan Loan from the FDIC to OneWest*

On March 19, 2009, the FDIC entered into an agreement with OneWest entitled the Servicing Business Asset Purchase Agreement ("SBAPA"),[16] which assigned the Horan Loan to OneWest. The SBAPA provided that "Seller [*i.e.*, the FDIC, as receiver for IndyMac Fed[17]] hereby sells, transfers, conveys, assigns and delivers to the Purchaser [*i.e.*, OneWest], and the Purchaser hereby purchases, accepts and assumes from the Seller, without representation or warranty, express or implied, except as set forth in this Agreement . . . , all of the Seller's rights, title and interests in, to and under the Assets." (SBAPA § 2.01.) "Assets" were defined to include "all Servicing Rights accruing to the Seller under the Servicing Agreements," which are defined as "all Contracts . . . pursuant to which the Seller acts as a mortgage loan servicer," as well as "all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Seller with respect to . . . the ownership, use, function, value of or other rights pertaining to any Asset, whether arising by way of counterclaim or otherwise." (SBAPA §§ 1.01, 2.01(a), (g).)

     6.     *Criminal Charges Against Reskakis*

On or about October 13, 2009, Reskakis, together with several other individuals, was indicted for bank fraud and conspiracy to commit wire and bank fraud for acts allegedly

---

[16] The SBAPA is filed at Greenberg Dec., Ex. C (ECF No. 102).
[17] Apparently the FDIC was appointed as receiver of IndyMac Fed on the date of the SBAPA. (*See* SBAPA, p. 1.)

committed by Reskakis between June 2007 and January 2008. (Dougherty Aff., Ex. B ¶ 8.)[18]
Reskakis and others were accused of defrauding lenders by using straw buyers to falsely obtain loans in a scheme similar to the one alleged by plaintiffs. (*Id.* ¶¶ 8-9.)[19]

B.  *Procedural History*

OneWest filed its initial complaint in this action on March 9, 2010. (ECF No. 1.) On December 29, 2010, Deutsche Bank joined the case as a plaintiff, and OneWest and Deutsche Bank jointly filed the Third Amended Complaint ("Complaint"), which is the operative pleading for purposes of the instant motions to dismiss. (ECF No. 45.) The Complaint alleges fourteen causes of action.

S&F, Reskakis and Neumann each filed motions to dismiss the Complaint. (ECF Nos. 21, 25, 49, 51.) S&F's memorandum (which Reskakis adopted) challenged this court's subject matter jurisdiction and the plaintiffs' standing to bring ancillary tort claims that arose from the originating loan transaction. (ECF No. 51.) S&F also sought to dismiss certain claims on the ground that they were insufficiently pled. (ECF No. 51.) Neumann joined S&F's arguments in full and further sought to dismiss the claims against her for fraud, unjust enrichment and an equitable lien as deficiently pled and implausible. (ECF No. 49.) In July 2011, I denied these motions without prejudice to renewal after limited discovery into standing. *See* July Order at 13-14.

At the conclusion of the limited discovery period, S&F (joined in full by Reskakis) and Neumann filed renewed motions to dismiss the Complaint.[20] (ECF Nos. 98-100.)

---

[18] The Affirmation of Donna Dougherty was filed by Neumann in support of her first motion to dismiss. (*See* ECF No. 49.)
[19] According to the docket sheet in his criminal case, *United States v. Reskakis*, No. 09-cr-0975 (GBD) (S.D.N.Y.), Reskakis pled guilty pursuant to a cooperation agreement on March 15, 2011, to one charge of conspiring to commit wire fraud and bank fraud. He is scheduled to be sentenced on February 28, 2012.
[20] The other two sisters – Erez and Ovits – have filed Answers to the Complaint. (ECF Nos. 35-36.) The Clerk of Court has entered a notation of default against defendants Joam, The Mortgage Zone, GE Land

The parties no longer challenge subject matter jurisdiction. However, S&F again argues that the plaintiffs lack standing to sue for ancillary claims arising from the originating loan transaction. (ECF No. 99.) Both S&F and Neuman also argue that the plaintiffs' common law claims against them should be dismissed as deficiently pled and otherwise implausible. (ECF Nos. 98-99.)

DISCUSSION

A. *Legal Standard*

In evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiffs' favor. *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

On a motion to dismiss "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers*, 282 F.3d at 152 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. Co.*, 62 F.3d 69, 72 (2002)). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Id.* at 153 (quoting *Int'l Audiotext*, 62 F.3d at 72).

---

Services, Inc., and 85 Pulaski. (ECF Nos. 75, 77.) I deferred entering a default judgment against these defendants until the question of the plaintiffs' standing to bring these claims could be resolved. *See* July Order at 13. Horan has appeared at status conferences *pro se* and appears to have been deposed, even though he has neither filed an Answer in response to the Complaint nor moved to dismiss it.

B.  *Standing Analysis*

   1.  *Whether the Claims Against S&F and Reskakis Were Assigned by American Brokers to IndyMac through the MLPISA*

All relevant events surrounding the origination of the Horan Loan occurred in New York. Horan, a New York resident, applied for and closed on the loan in New York, to finance the purchase of a property in New York. Reskakis, a resident and licensed attorney of New York, oversaw the closing in New York and received and distributed the loan proceeds in New York. Accordingly, the parties agree that New York law governs the substance of any ancillary tort claims that accrued to American Brokers as a result of the events surrounding the loan transaction.

However, the plaintiff here is not American Brokers. American Brokers assigned its interest in the Horan Loan to IndyMac a few months after funding the loan. The parties' limited discovery has produced the document which governed this assignment: the MLPISA. The question before me is whether IndyMac received through its assignment from American Brokers not just the right to the stream of payments due on the note for the Horan Loan, but also the right to bring ancillary claims arising from the circumstances of the loan's origination. Under the terms of the MLPISA, American Brokers' conveyance of the Horan Loan expressly included "without limitation the Mortgage File, the Monthly Payments, *and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan*." (MLPISA, p. 4 (emphasis added).) The MLPISA also provided that the agreement "shall be governed by and construed in accordance with the laws of the State of California." (MLPISA § 5.08.)

In a diversity action such as this one, a federal court applies the choice-of-law rules of the state in which the court sits. *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135,

147 (2d Cir. 2008). New York choice-of-law rules provide that in interpreting a contract with an express choice-of-law provision, a court should apply the law selected in the contract.[21] *Hartford Fire*, 230 F.3d at 556. Therefore, California law governs the interpretation of the MLPISA, including the question of whether the MLPISA conveyed to IndyMac ancillary claims deriving from the origination of the Horan Loan.[22]

California law allows for the broad assignability of claims. *See generally* 7 Cal. Jur. 3d Assignments § 4. Since a legislative change in 1872, it has been the law of California that "assignability of things in action is now the rule; nonassignability, the exception." *Goodley v. Wank & Wank*, 62 Cal. App. 3d 389, 395 (Cal. Ct. App. 1976) (quoting *Rued v. Cooper*, 109 Cal. 682, 693 (1893)); *see* Cal. Civ. Code § 954 ("A thing in action, arising out of the violation

---

[21] There are three exceptions to this rule, none of which is applicable here. First, the choice-of-law provision is not binding if the state selected (here California) did not have sufficient contacts to the parties or the contract. *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). This exception does not apply here, because IndyMac was a California company (*see* MLPISA, p. 1), and a sufficient relationship exists where one of the contracting parties is a resident of the state. *New Falls Corp. v. Lerner*, 352 F. App'x 596, 598 (2d Cir. 2009). Second, the law designated will not apply if its application would violate a "fundamental policy" of the state with a "materially greater interest" in the determination of the dispute. *See Hartford Fire*, 230 F.3d at 556; *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 170-71 (S.D.N.Y. 2006). The plaintiffs assert that New York has a materially greater interest in the determination of this dispute than California. Even if this is so, the application of California law violates no fundamental policy of New York. California generally allows assignment of ancillary claims, but does not allow assignment of legal malpractice claims. *See generally* 7 Cal. Jur. 3d Assignments §§ 4, 6-7. New York allows assignment of ancillary claims based on the intent of the contracting parties, *Banque Arabe Et Int'l D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 152 (2d Cir. 1995), and is not offended by contracts that fail to assign legal malpractice claims, *see, e.g.*, *State of Cal. Pub. Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 435-36 (2000). Thus New York has expressed no "fundamental policy" that conflicts with the application of California's law. *See New Falls Corp.*, 352 F. App'x at 598 (holding that Connecticut's "mixed approach to the assignability of malpractice claims" did not constitute a "fundamental policy" in conflict with the application of California law). Finally, a choice-of-law provision is not binding if it was procured through duress or fraud. *Hartford Fire*, 230 F.3d at 556. However, there is no allegation of that here.

[22] The plaintiffs argue that New York law should apply to my interpretation of the MLPISA as a matter of judicial estoppel and/or the law of the case doctrine. Pls.' Opp. Memo. at 19-21 (ECF No. 102). In my first opinion in this case, I applied New York law to determine the scope of assignment from American Brokers to IndyMac. *See* July Order at 9. However, at that time, the only documentation before me evidencing the assignment from American Brokers to IndyMac was an endorsement stamp. Now the parties have uncovered the MLPISA, which both parties agree governs the assignment from American Brokers to IndyMac. I cannot fathom a reason why I would now consider the MLPISA to govern the assignment and yet excise its choice-of-law provision. Indeed, given that it is the *plaintiffs* that benefit from my revisiting the question of the scope of the assignment based on the newly discovered MLPISA, their assertion that the defendants should be bound by my prior opinion on the matter strikes me as disingenuous.

of a right of property, or out of an obligation, may be transferred by the owner."); *see also id.* § 953 ("A thing in action is a right to recover money or other personal property by a judicial proceeding.").

However, California law generally prohibits the assignment of claims for legal malpractice. *Goodley*, 62 Cal. App. 3d at 395; *Jackson v. Rogers & Wells*, 210 Cal. App. 3d 336 (Cal. Ct. App. 1989). *See generally* 7 Cal. Jur. 3d Assignments §§ 6-7. The Second Circuit has held – in a case analogous to this one – that where a California choice-of-law provision governed an assignment contract, the contract could not have transferred any potential legal malpractice claims, even if such claims arose in a state which freely allows the assignment of legal malpractice claims. *New Falls*, 352 F. App'x at 598.[23] The court held: "California law determined [the parties'] rights and obligations under the assignment contract. As a result, the rights that [the assignee] acquired in the assignment could not have included a right to bring malpractice claims, which is a right that cannot be assigned under California law." *Id.*

Therefore, although the MLPISA broadly transferred "all other rights, benefits, proceeds and obligations arising from or in connection with" the Horan Loan (MLPISA, p. 4), which I expressly find includes the right to bring ancillary claims arising from the loan origination,[24] the MLPISA did not transfer potential legal malpractice claims to IndyMac, because such claims are unassignable under California law. Accordingly, I conclude that the

---

[23] When asked at oral argument, plaintiffs' counsel's only argument for why *New Falls* did not govern this case was that in *New Falls*, the court was applying Connecticut's choice-of-law principles rather than New York's. However, this is a distinction without a difference, because the analysis under both New York and Connecticut law is the same, and neither New York nor Connecticut has articulated a fundamental policy against the nonassignment of legal malpractice claims.

[24] The Purchase Bid and Trade Confirmation, filed at Colagiacomo Dec., Ex. B (ECF No. 104), confirms that the conveyance of loans from American Brokers to IndyMac included the full spectrum of rights associated with the loans. The Purchase Bid and Trade Confirmation specified that IndyMac purchased the loans on a "servicing-released" basis. As explained by Damian Voulo, a former employee of American Brokers, this means that American Brokers did not retain any rights on the loans – not even servicing rights. (Voulo Dec. ¶ 3 9 (ECF No. 104-8).)

legal malpractice claims against Reskakis and S&F (plaintiffs' first and twelfth causes of action) must fail for lack of standing, because the first link of the assignment chain leading from American Brokers to OneWest failed to transfer the right to bring these claims.

However, although California prohibits the assignment of ordinary legal malpractice claims, claims of fraud – even when brought against an attorney – are assignable. "Fraud or deceit is not legal malpractice . . . . Fraud is no more a necessary incident to the rendition of legal services than dishonesty is to any other profession. The avoidance of fraudulent conduct requires no special skill or knowledge, but only basic precepts of honesty and integrity." *Jackson*, 210 Cal. App. 3d at 344 (quoting Mallen & Smith, Legal Malpractice § 8.8, p. 421 (3d ed. 1989)). Regardless of how a plaintiff labels his claims, his claims sound in legal malpractice and are nonassignable where they "require[e] a trial court to second-guess the attorney's professional evaluations" or to evaluate "'judgment calls' within the scope of the attorney's legal representation of the client." *Id.* at 346. However, where a plaintiff alleges "a calculated course of deception," as opposed to merely "a series of poor 'judgment calls'" the fraud claim is distinct from an ordinary legal malpractice claim, despite any "[f]actual overlap between the allegations supporting" the two claims. *Landmark Screens, LLC v. Morgan, Lewis & Bockius LLP*, No. 08-CV-2851 (HRL), 2009 WL 160214, at *6 (N.D. Cal. Jan. 20, 2009).[25]

---

[25] California's prohibition on the assignment of legal malpractice claims derives from its larger prohibition on the assignment of purely personal wrongs. Thus, California law holds that where an attorney acquires something of independent value through fraud, such as a specific piece of property or a determinate sum of money, the action is assignable because it caused harm to the victim's property, not just his person. *See Jackson v. Deauville Holding Co.*, 219 Cal. 498, 501 (1933) ("[W]here *property* is obtained by deceit or fraudulent device of any sort, the cause of action is assignable."); *Jackson*, 210 Cal. App. 3d at 345-46 ("Where specific property of a plaintiff's assignors was fraudulently acquired and the plaintiff's estate thus diminished by fraud or deceit, assignment was allowed. . . . Conversely, where the fraud allegations could not be traced to a particular deprivation of particular property, assignment was deemed improper."). Thus, where an attorney's fraud "induced [the plaintiff's assignors] to part with" a thing that has "value independent of the right to sue for fraud," the cause of action is assignable, because such frauds constitute "causes of action arising from torts *which affect the estate* rather than the person of the individual who is injured." *Jackson*, 219 Cal. at 500, 502.

Here, the Complaint alleges that S&F and Reskakis engaged in intentional fraud and deceit that deprived American Brokers (IndyMac's assignor) of specific property of independent value: namely, $999,999 in loan proceeds. The claim is not just that Reskakis's conduct fell below the general standard of care expected of the legal profession by making poor judgment calls. If the Complaint's allegations are true, Reskakis intentionally defrauded American Brokers by, *inter alia*, engineering a duplicate sale of the same property, concealing the fact of the first sale from the bank to induce it to finance the second sale, and intentionally eliciting an inflated appraisal for the property to induce the bank to release enough funds both to cover the cost of the home and to pay off all participants in the scheme. Because this claim goes far beyond ordinary legal malpractice and alleges a fraud that resulted in the deprivation of determinable property, under California law, such claims are assignable.

Accordingly, I find that all other ancillary claims against S&F and Reskakis were successfully assigned by the MLPISA.[26] The MLPISA's language was broad enough to encompass ancillary claims. Assignment of these claims is permitted under California law because they allege fraud and deceit outside the realm of mere negligence, which led to the loss of specific property that is independent of the purely personal wrong of delivering substandard legal services. Thus, so long as the remaining links in the assignment chain were adequate to convey the claims, the plaintiffs have satisfied their burden of demonstrating standing to bring the other causes of action against S&F and Reskakis.[27]

---

[26] The defendants' argument, *see* S&F Memo. at 11-12 (ECF No. 99-1), that ancillary claims were not assigned because § 3.03 of the MLPISA (providing for "Remedies for Breach of Representations and Warranties") constitutes the "sole remedies" provision of the MLPISA is without merit. This provision clearly relates only to remedies for breach of warranty claims against American Brokers; it does not purport to limit IndyMac's remedies against third-party tortfeasors.

[27] Counsel for S&F argued at oral argument that even if such claims were assigned by the MLPISA, New York law deems them "redundant" with a legal malpractice claim, and accordingly they should be dismissed as well. *See also* S&F Memo. at 9, n.7. It is true that under New York law, a claim for breach of fiduciary duty is duplicative of a legal malpractice claim where the basis of the fiduciary breach is the very malpractice alleged and

14

2.   *Whether the Claims against Reskakis and S&F Were Transferred to IndyMac Fed under the APAA*

The defendants contest one other link in the assignment chain of the Horan Loan.[28] The defendants argue that the APAA, which governed the assignment of the Horan Loan from IndyMac (then in FDIC receivership) to IndyMac Fed (in FDIC conservatorship), excluded ancillary claims from the assignment. They base this argument on § 3.4(b) of the APAA, which provides that

> The Assuming Bank [*i.e.*, IndyMac Fed] does not purchase, or obtain an option to purchase under this Agreement:
> . . .
> (b) any interest, right, action, claim, or judgment against (i) any . . . attorney, or any other Person employed or retained by the Failed Bank [*i.e.*, IndyMac] . . . arising out of any act or omission by such Person in such capacity . . . or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; <u>provided</u>, <u>that</u> for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered . . . .

APAA § 3.4(b)(i), (iv).

---

the two claims seek identical remedies. *See Nordwind v. Rowland*, 584 F.3d 420, 432-33 (2d Cir. 2009). And a conversion claim for the payments made to an attorney for his services is redundant with a legal malpractice claim where the attorney committed no other independent wrong in assuming ownership of the money. *See Amadasu v. Ngati*, No. 05-CV-2585, 2006 WL 842456, at *11 (E.D.N.Y. Mar. 27, 2006). However, there is no redundancy here for two reasons: first, the Complaint plausibly alleges that Reskakis wrongfully obtained property from American Brokers beyond that which he claimed as a fee for services; and second, there is no longer any legal malpractice claim in this lawsuit with which to be redundant, as I have already ruled that the claims for legal malpractice did not survive the MLPISA assignment.

[28]   The other two assignments in the chain leading to OneWest's eventual ownership – governed by the PSA and the SBAPA, respectively – indisputably transferred all ancillary claim rights. In my prior opinion, I ruled as a matter of law that the PSA reserved to IndyMac whatever right it had to bring ancillary claims arising from the origination of the Horan Loan. *See* July Order at 12. And the SBAPA, which governed the final assignment of the Horan Loan from IndyMac Fed to OneWest, provided that OneWest acquired from IndyMac Fed "all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Seller with respect to . . . the ownership, use, function, value of or other rights pertaining to any Asset, whether arising by way of counterclaim or otherwise." (SBAPA § 2.01(g).) No party disputes that this broad language sufficed to transfer all ancillary claims. I note as a final matter that there is no question that the FDIC-as-receiver inherited all ancillary claim rights held by IndyMac by operation of law when it was appointed receiver for IndyMac and thus "step[ped] into the shoes of" IndyMac under 12 U.S.C. § 1821(d)(2)(A). *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994).

This argument lacks merit. The claims against Reskakis and S&F clearly were not excluded by subsection (i), which on its face applies only to claims against attorneys or other persons "employed or retained by" the Failed Bank, *i.e.*, IndyMac. S&F admits that neither S&F nor Reskakis was employed or retained by IndyMac. Instead, S&F argues that, in "equity," S&F should be treated as if it were retained by IndyMac, because it was retained by American Brokers, and IndyMac stepped into the shoes of American Brokers when it was assigned the loan. S&F Memo. at 17. I disagree. Because S&F and Reskakis were never employed or retained by IndyMac, APAA § 3.4(b)(i) does not apply to claims against them, and I decline to broaden the scope of this exception beyond its textual boundaries.

Nor did subsection (iv) exclude these claims. At first blush, it might appear that Reskakis qualifies as "any other Person whose action or inaction may be related to any loss . . . incurred by the Failed Bank." APAA § 3.4(b)(iv). However, the provision relates only to losses that were *incurred* by the Failed Bank, *i.e.*, IndyMac. The losses relating to the conduct of Reskakis and S&F were *incurred by* American Brokers – the victim of the fraud. IndyMac did not itself incur any loss as a result of Reskakis and S&F's conduct. Instead, what IndyMac received and held was an asset – the right to bring a claim against Reskakis and S&F for the fraud they perpetrated on American Brokers. IndyMac also received a mortgage loan that was worth less than its apparent value, *i.e.*, the Horan Loan itself. But even a less valuable asset is still an asset; this too does not qualify as a "loss . . . incurred by" IndyMac.[29] Accordingly, I find

---

[29] This interpretation is consistent with the overall scheme of FDIC receivership. Under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. 101-73, 103 Stat. 183 (1989) (codified in scattered sections of 12 and 15 U.S.C.), claims by creditors against failed banks seized by the FDIC are "route[d] . . . through an administrative review process." *Auction Co. of Am. v. FDIC*, 141 F.3d 1198, 1200 (D.C. Cir. 1998); *see* 12 U.S.C. § 1821(d). Any claim that is effectively against the failed bank – seeking "payment from . . . the assets" of the failed bank or "relating to any act or omission" of the failed bank – must be brought in this administrative proceeding in this first instance. *See* 12 U.S.C. § 1821(d)(13)(D); *see also id.* § 1821(d)(6)(A)(i); *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1143 (D.C. Cir. 2011) (explaining that the claims barred from judicial review by § 1821(d)(13)(D) "parallel those contemplated under FIRREA's administrative

that the APAA transferred the right to bring these claims to IndyMac Fed, notwithstanding § 3.4(b) of the agreement.

C. *Sufficiency of the Pleadings*

S&F and Neumann also argue that the common law causes of action asserted in the Complaint are deficiently pled. S&F contends that the allegations of supervisory responsibility were not pled with sufficient particularity, that the plaintiffs have not established privity for the breach of fiduciary duty claim, that equity does not weigh in favor of an unjust enrichment award, that there is a separate legal remedy precluding an accounting remedy and that the conversion claim against Reskakis is improperly premised on a breach of contract. S&F Memo. at 19-30. I find that the Complaint sufficiently states a cause of action for each of these claims.

Neumann argues that the claims against the sisters – for fraud, equitable lien, and unjust enrichment – should be dismissed because "it would appear that" the sisters did not know about Reskakis's fraud and were themselves pawns in his scheme. Neumann Memo. at 8 (ECF No. 98-6). Discovery may in fact exonerate the sisters from liability for the fraud. However, at this early stage, the Complaint clearly states a basis for its claims against the sisters. The sisters' signatures are affixed to two different sales contracts – one to Joam for $715,000, and one to Horan for $1.3 million. Although Neumann attempts to assert through her moving papers that "[t]he sisters were unaware of" the second sale, and that "their purported signatures on the documents from the alleged second sale were forgeries," Neumann Memo. at 3, I must accept the

---

claims process laid out in the greater part of § 1821(d)" (quoting *Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269, 1274 (10th Cir. 1994))). Thus it makes sense that a loss *incurred by* the failed bank through its own operations might be retained by the FDIC to be resolved through the claims process, rather than passed on to the assuming bank. By contrast, a claim that the failed bank *owned* against a third-party, which accrued prior to the failed bank's assumption of it, is not a claim *against* the failed bank and thus would not be subject to the FIRREA claims process. Accordingly, the FDIC would have no reason not to pass it along to the assuming bank.

allegations of the Complaint as true and draw all reasonable inferences in favor of the plaintiffs. Accepting as true that the second sale contract bore the sisters' signatures, I am bound to draw the inference at this early stage that the sisters were complicit in the scheme to sell their house twice and defraud the bank in the process.

## CONCLUSION

Because the first assignment of the Horan Loan did not include the right to bring attorney malpractice claims, S&F's motion to dismiss the Complaint is granted in limited part: The first and twelfth causes of action asserted in the Complaint are dismissed for lack of standing. The motions to dismiss the Complaint filed by S&F, Reskakis and Neumann are otherwise denied, as the plaintiffs' remaining claims are adequately pled and state causes of action upon which relief can be granted.

So ordered.


John Gleeson, U.S.D.J.


Dated: January 23, 2012
      Brooklyn, New York